1  PANISH SHEA & BOYLE LLP
   KEVIN BOYLE, State Bar No. 192718
2     *boyle@psblaw.com*
   RAHUL RAVIPUDI, State Bar No. 204519
3     *ravipudi@psblaw.com*
   11111 Santa Monica Boulevard, Suite 700
4  Los Angeles, California  90025
   Telephone: 310.477.1700
5  Facsimile: 310.477.1699

6  THE X-LAW GROUP, PC
   FILIPPO MARCHINO, State BarNo.
7  256011
      *filippo.marchino@xlawx.com*
8  Damon Rogers, State Bar No. 263853
      *damon.rogers@xlawx.com*
9  633 W. 5th St., 26th Floor, Suite 2629
   Los Angeles, CA  90071
10 Telephone:  213.223.2232
   Facsimile:  213.226.4691
11

12 Attorneys for Plaintiff
13

14              **UNITED STATES DISTRICT COURT**

15        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

16

| | |
|---|---|
| 17  ANDRE BATUNGBACAL, an individual, | **NATIONWIDE CLASS ACTION** |
| 18             Plaintiff, | Case No. SA CV11-00018 CJC (MLGx) |
| 19        v. | **DECLARATION OF DR. ANDREW SAFIR IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT** |
| 20  POWER BALANCE LLC, a Delaware Limited Liability Company, TROY JOHN RODARMEL, an individual, JOSH RODARMEL, an individual, KEITH KATO, an individual, and DOES 1 through 10, inclusive, | |
| 24             Defendants. | |

26 / / /
27 / / /
28 / / /

DECLARATION OF DR. ANDREW SAFIR

# DECLARATION OF DR. ANDREW SAFIR

I, Dr. ANDREW SAFIR, declare as follows:

1. This Declaration is based upon my personal knowledge and on information provided to me by counsel for the Plaintiffs and Defendants, which I have assumed to be true. If called as a witness, I could competently testify to the following:

## Summary of Opinions

2. As a result of my review of the material underlying this case and my understanding of the economics underlying class action litigation, I have concluded that the proposed settlement ("Settlement Agreement")[1] for the Proceeding referenced above represents an economically reasonable and fair settlement.

3. This settlement provides Plaintiffs with an amount greater than anything that the putative class could have recovered in a lawsuit with a final judgment. In particular, recovery for all class members under this Settlement Agreement is over twice what could be recovered by way of final judgment.

4. Based upon the information I have been provided with and the allegations pled in the complaint, the total number of Power Balance Products sold to United States consumers is approximately 2 million units. The total revenue Power Balance received – which is the maximum recovery for restitution by way of a final judgment – is about $31,600,000. In comparison, the potential estimated class recovery under the Settlement Agreement is in excess of $61,000,000.

## Qualifications for Opinions

5. I am the President of Recon Research Corporation, an economic consulting firm that I founded in 1980. I hold a Ph.D. in Economics from Tufts University. I also hold a Master's degree in Economics from Tufts University, and a

---

[1] *Nationwide Class Action Settlement Agreement*, March 2011.

BA degree in Psychology and Economics from the University of Colorado.

6. Prior to the founding of Recon Research, I held a variety of positions with the Federal and California governments. In 1972, I was appointed as a staff member to the President's Council of Economic Advisers specializing in international trade policy, and in mid-1973 joined the White House Council on International Economic Policy as a professional member specializing in finance. In 1974, I moved to the Department of Justice, where I served as the senior economic advisor to the Office of Justice Policy, Planning, and Research. In 1975, I was appointed as the Assistant Director of the Office of International Energy Policy at the U.S. Treasury. I left this position in 1978 to join the Administration of Governor Edmund G. Brown, Jr., as the Chief Business Economist for the State of California. However, I remained a special advisor to the U.S. General Accounting Office specializing in energy, international finance, and national security issues throughout much of the 1980s.

7. In my government career, and as President of Recon Research, I have had extensive experience in analyzing, constructing and utilizing complex damage models, and reviewing the work of other analysts and experts. I have also testified extensively both in regulatory proceeding and in court regarding the appropriate construction and utilization of economically reasonable damage models, and the standards of statistical reliability such models should exhibit. A list of my appearances in court, before arbitration panels or in regulatory proceedings since September 2007 is attached as Exhibit 1.

8. I also have experience in the economic requirements of class action litigation. During the past several years I have been actively involved in a number of large class action suits regarding such matters as antitrust, energy, and wage and hour disputes.

9. In conducting my analysis and forming my opinions, I have examined and relied upon material provided by counsel.[2] I have also relied upon my economic training and experience, a summary of which has been provided in Paragraphs 3–6 above, as well as upon discussions with Plaintiff's counsel.

10. On February 4, 2011 I participated in the mediation which ultimately culminated in the proposed Settlement Agreement. In addition, on September 20, 2011, I participated in a conference call with Mr. Mort Bachman, a member of Power Balance's Board of Managers. During that call, I reviewed additional information that I had received regarding the current financial status of Power Balance.

### Background of Proposed Settlement Agreement

11. This case is a nationwide class action brought on behalf of Andre Batungbacal and the members of the Class for damages they have sustained as a result of deceptive and misleading conduct in marketing, advertising, selling, promoting and distributing Power Balance products on the part of defendants Power Balance LLC, Josh Rodarmel, Troy Rodarmel, and Keith Kato ("Defendants").

12. Plaintiffs allege that Defendants distributed in commerce, among other things, the Power Balance Bracelets, Power Balance Wristbands, Power Balance Pendants, Power Balance necklaces and other Power Balance Jewelry, collectively referred to as "Power Balance Accessories" or "Accessories." Defendants made claims that the "Mylar Holograms" contained in every Power Balance Accessory possess certain properties, such as the ability to improve balance, physical strength and flexibility. Plaintiffs contend that in reality, there is no scientific proof to support these claims. Defendants' assertion of these deceptive and misleading

---

[2] Specifically, this material included the *Nationwide Class Action Complaint for Unfair Business Practices, False Advertising and Violation of Consumers Legal Remedies Act*, January 11, 2011; Power Balance Sales 2009, 2010, 2011; and the *Nationwide Class Action Settlement Agreement*, March 2011.

advertising and marketing claims led to widespread purchases of Power Balance Accessories.

13. In their complaint, the Plaintiffs have requested injunctive and retroactive relief. Specifically, the Plaintiffs have asked that Defendants be preliminarily and permanently enjoined from engaging in unlawful, unfair, deceptive and misleading practices and conduct regarding marketing, advertising, selling, promoting and distributing "Power Balance Accessories." Plaintiffs also seek restitution from Defendants of all revenues, earnings, compensation and benefits obtained as a result of Defendants wrongful conduct.

14. The Settlement Agreement provides for a number of benefits to class members:

    a. <u>Full Refund of Purchase Price To Any Unsatisfied Class Members</u>: Any Class Member will be allowed to return Power Balance Accessories to the Claims Administrator in exchange for a one hundred percent (100%) refund of the retail price for the returned products, plus an additional $5.00 to cover shipping and handling expenses related to submitting a Claim.

    b. <u>Creation of Settlement Fund</u>: In order to fund Qualifying Class Members' Claims, Power Balance agrees to set up a Settlement Fund, with an initial contribution of five hundred thousand dollars ($500,000). Power Balance will pay this initial amount into the Settlement Fund by the first day of the Claims Period. The Settlement Fund will be augmented in tranches of $250,000, whenever approved claims cause the fund to fall below $250,000. Any monies left over in the Settlement Fund at the conclusion of the claims process will be donated to a charity of Power Balance's choice.

    c. <u>Injunction / Change In Advertising</u>: In order to address any contentions that Power Balance's advertising is false or misleading, and subject to Court approval, Power Balance will agree to a permanent Injunction and change its advertising. Specifically, Power Balance will not represent in any advertising to

potential customers that Power Balance Products will "improve balance, strength or flexibility" or that Power Balance Products "work with your body energy," unless and until Power Balance is able to provide the Court with evidence that supports such representations. Power Balance also will not use a Muscle Test to demonstrate the potential benefits of its Power Balance Products, unless and until Power Balance is able to provide the Court with evidence demonstrating the efficacy of the Muscle Test.[3]

### Economic Value of the Proposed Settlement

15. Based on the information provided by Power Balance, in particular, historical sales data for 2009 through April 2011, I was able to estimate the value of the proposed Settlement Agreement to Class Members.

16. Power Balance sales were made either to wholesalers or directly to customers (retail sales). The revenues received from sales to wholesalers were based on a much lower average price than the retail price received from sales directly to customers. However, according to the proposed Settlement Agreement, the benefits received by each class member will be equal to the *full retail price paid for each Power Balance Accessory*. As a result, the total benefits received by the proposed class would equal the number of Accessories sold times their average retail price.

---

[3] According to the Settlement Agreement, "Muscle Test" means those physical tests that Power Balance has used in the past to demonstrate the potential benefits of its Power Balance Products. These tests include the following: (i) a prospective customer extending his or her arms out and having a third party push on the customer's arms – both with and without the customer wearing a Power Balance Product – to determine if the Power Balance Product helps improve the customer's balance; (ii) a prospective customer standing with feet at shoulder width and having a third party pull vertically on the customer's arm – both with and without the customer wearing a Power Balance Product – to determine if the Power Balance Product helps improve the customer's strength; or (iii) a prospective customer being asked to rotate sideways while standing with feet at shoulder width – first without and then with the customer wearing a Power Balance Product – to determine if the Power Balance Product helps improve the customer's flexibility.

17. Power Balance has provided data that separate its wholesale earnings from its retail earnings. In addition, Power Balance has provided data that indicate the number of Accessories sold directly at retail prices and the number sold at wholesale prices. On the basis of this data, it is possible to determine the average retail price. According to the data provided by Power Balance, the average retail price for the 2009 through 2011 period was about $30 per Accessory.

Table 1
Power Balance Sales Revenue, Units Sold

Power Balance Revenue

| Type | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|
| Retail Sales | $648,421 | $7,243,865 | $1,439,951 | $9,332,237 |
| Wholesale Sales | $573,898 | $14,704,107 | $6,993,691 | $22,271,696 |
| Total Sales | $1,222,319 | $21,947,972 | $8,433,642 | $31,603,933 |

Number of Power Balance Accessories Sold

| Type | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|
| Retail | 21,620 | 238,821 | 47,327 | 307,768 |
| Wholesale | 42,511 | 1,150,963 | 523,424 | 1,716,898 |
| Total Units | 64,131 | 1,389,784 | 570,751 | 2,024,666 |
| Average Units per Customer | | | | 1.8 |
| Customers | | | | 1,124,814 |

Average Price Per Unit

| Type | 2009 | 2010 | 2011 | |
|---|---|---|---|---|
| Retail | $29.99 | $30.33 | $30.43 | $30.32 |

18. The extent to which the proposed Settlement Agreement provides benefits to Class Members depends in part on the number of individual that comprise the Class. According to the data provided by the Defendants, Power Balance sold more than 2 million Accessories between 2009 and April 2011. In addition, Power Balance has indicated that each customer purchased on average 1.8

Accessories. As a result, a reasonable estimate of the number of class members would be about 1,125,000. (See Table 1.)

19. As indicated previously, the proposed Settlement Agreement offers benefits to each class member that equal the full retail price paid for each Power Balance Accessory. As a result, if the average retail price were $30 and about 2 million Power Balance Accessories were sold, then Power Balance's exposure would be about $61 million. (See Table 2.) It should also be noted that Power Balance has agreed to pay an additional $5.00 for each approved claim to cover shipping costs. As a result, assuming that each of the estimated 1,125,000 class members filed an acceptable claim, the potential class benefits would include another $5.6 million. Moreover, Power Balance has also agreed to incur inspection costs to guard against counterfeit or false claims. As a result, Power Balance has agreed to be at risk for outlays and costs in excess of $67 million, far exceeding the demands made by Plaintiffs in their complaint.

Table 2
Potential Class Recovery

| | |
|---|---:|
| Number of items purchased | 2,024,666 |
| Full recovery per item | $30.32 |
| Full recovery | $61,387,873 |
| Customers | 1,124,814 |
| Shipping Costs @ $5 per Class Member | $5,624,072 |
| Potential Power Balance exposure | $67,011,945 |
| Power Balance revenue from sales | $27,564,247 |

20. While the proposed Settlement Agreement calls for a full refund to Class Members, Plaintiffs, in their complaint, asked for a restoration of all monies earned by Power Balance as a result of its alleged false and misleading statements. At most, for 2009 through February 2011, restitution would be equal the almost $28 million in revenues received by Power Balance. In contrast, proposed class

8
DECLARATION OF DR. ANDREW SAFIR

members could receive benefits that exceed $67 million.

21. I believe the proposed Settlement Agreement is economically reasonable. At a minimum, Class Members are allowed to recover whatever expenditures were made on Power Balance Accessories. Moreover, even though Power Balance may have only received a portion of these expenditures, the company is willing to pay out the full retail price, plus shipping costs, for any qualified claim.

22. I also understand that since the initial request for preliminary approval of class settlement was accepted by the Court, the judge in this proceeding reopened discovery to investigate the degree to which the financial condition of Power Balance might prevent it from honoring the proposed settlement. As a result, additional financial information for Power Balance was made available to me.

23. On the basis of this additional financial information, it is apparent that Power Balance revenues and profitability have declined in 2011, relative to 2010. For the six months ending June 30, 2011, Power Balance has experienced a net loss of about $7 million, compared to a net income of about $15.6 million for all of 2010. Although the turnaround in financial performance could have adverse effects on the ability of Power Balance to comply fully with the Settlement Agreement, there is still considerable uncertainty regarding this possibility. It should be noted that the decline in sales may be temporary and that there could be a rebound during the remainder of the year. In addition to my review of documents, my discussion with Power Balance management indicated that the company was taking actions to reduce costs, open new sales avenues, pursue new equity participation and secure long term financing.

24. Despite the deteriorating financial condition of Power Balance, it is my opinion that this is still a very good settlement for class members and should be implemented as soon as possible. First, it allows any class member who so desires to claim full restitution. Second, if Power Balance's current sales trend continues

and earnings continue to fall, then a prompt rather than delayed settlement increases the likelihood that Power Balance will be able to honor all requests for reimbursement filed pursuant to the Settlement Agreement.

I declare, under penalty of perjury according to the laws of the United States of America, that the foregoing is true and correct.

Executed on this 21st day of September 2011 in Los Angeles, California.

_____
ANDREW SAFIR

# Exhibit 1
## Testimony in deposition, trial or before regulatory bodies of Dr. Andrew Safir since September 2007

a. Depositions Given as an Expert Witness:

*Herrera and Blazing Industrial Steel, Inc. v Lopez and Wide Flange Steel, Inc.*, Superior Court of the State of California, County of Riverside, Case No. RIC479176, August 25, 2011.

*Toby Harris et al. v Investor's Business Daily, Inc., et al.*, Superior Court of the State of California, County of Los Angeles, Central District, Case No. BC 269313, June 24, 2011.

*Arminak & Associates, Inc. v. Saint-Gobain Calmar, Inc.*, United States District Court for the Central District of California, Southern Division, Case No. SACV-04-1455 CJC (AJWx), September 3, 2010 and January 27, 2011.

*Falcon Stainless, Inc, v. Rino Companies*, United States District Court for the Central District of California, Case No: SACV08-926 AHS (MLGx), October 28, 2010.

Emergency Response Marketing, Inc. v. Gulf States Toyota, Inc., Case No. 1220038909; Judicial Arbitration and Mediation Services (JAMS), Los Angeles, CA, April 10, 2010.

*Amerind Risk Management Corporation v Brown & Brown Insurance, Inc., and Brown & Brown of New Mexico, Inc.*, Second Judicial District Court, County of Bernalillo, New Mexico, Case No D-202-CV-2007-6470, March 26, 2010.

*USA Capital Diversified Trust Deed Fund, LLC, v. Wells Fargo Bank, N.A.*, United States Bankruptcy Court, District of Nevada, Adversary No. 08-01135, January 20, 2010.

*Toby Harris et al. v Investor's Business Daily, Inc., et al.*, Superior Court of the State of California, County of Los Angeles, Central District, Case No. BC 269313, January 14, 2010.

*Editorial Caballero, S.A. de C.V., et al. v. Playboy Enterprises Inc.*, District Court, Hidalgo County, Texas, 332nd Judicial District, Cause No. C-762-98-F, August 19, 2009.

*In re: Motor Fuel Temperature Sales Practices Litigation*, U.S. District Court for the District of Kansas, MDL No. 1840, Case No. 07-MD-1840-KHV/JPO, June 22, 2009.

*Saint John's Medical Plaza, L.P. , v. Morlin Management Corporation, et. al.*, Superior Court of the State of California for the County of Los Angeles, April 27, 2009.

*Ineos USA LLC v. BP Products North America Inc.*, before the American Arbitration Association, Arbitration No. 13 158 Y 01929 06, February 4, 2009.

*Cadiz, Inc. v. Metropolitan Water District of Southern California*, Superior Court of the State of California, County of Los Angeles, Case No. BC 343232, March 20, 2008.

*Leisa Elliott, v. Starbucks Corporation LLC.*, United States District Court, Central District of California, Western Division, Case No. CV07-924-ODW (Ex) September 21, 2007.

*Leisa Elliott, v. Spherion Pacific Work LLC.*, United States District Court, Central District of California, Division, Case No. CV06-5032-ABC (PLAx) September 14, 2007.

b. Expert Witness Testimony at Trial or Arbitration:

*Falcon Stainless, Inc, v. Rino Companies*, United States District Court for the Central District of California, Case No: SACV08-926 AHS (MLGx), February 14, 2011

*USA Capital Diversified Trust Deed Fund, LLC, v. Wells Fargo Bank, N.A.*, United States Bankruptcy Court, District of Nevada, Adversary No. 08-01135, July 15, 2010.

*Amerind Risk Management Corporation v Brown & Brown Insurance, Inc., and Brown & Brown of New Mexico, Inc.*, Second Judicial District Court, County of Bernalillo, New Mexico, Case No D-202-CV-2007-6470, May 18, 2010.

*Editorial Caballero, S.A. de C.V., et al. v. Playboy Enterprises Inc.*, District Court, Hidalgo County, Texas, 332nd Judicial District, Cause No. C-762-98-F, April 21, 2010.

*Emergency Response Marketing, Inc. v. Gulf States Toyota, Inc.*, Case No. 1220038909; Judicial Arbitration and Mediation Services (JAMS), Los Angeles, CA, April 15, 2010.

*Toby Harris et al. v Investor's Business Daily, Inc., et al.*, Superior Court of the State of California, County of Los Angeles, Central District, Case No. BC 269313, March 29, 2010.

c. Testimony before Regulatory Bodies:

*Prepared Answering Testimony of Dr. Andrew Safir on Behalf of Indicated Shippers*, before the FERC regarding a rate proceeding for Enbridge Pipelines (Southern Lights) LLC, August 16, 2011, (IS10-399-000 and IS11-146-000).

*Written Evidence of Dr. Andrew Safir on Behalf of Imperial Oil* before the National Energy Board in the Matter of an Application by Enbridge Pipelines Inc., July 2011 (RH-1-2011).

*Affidavit of Dr. Andrew Safir on Behalf of the Indicated Shippers* before the FERC regarding a Complaint against Enbridge Pipelines (Southern Lights) LLC in connection with the operation of the Southern Lights Pipeline, May 11, 2011 (IS10-3900 and OR11-___).

*Written Evidence of Dr. Andrew Safir on Behalf of Imperial Oil* before the National Energy Board in the Matter of an Application by Enbridge Pipelines Inc., June 2010 (RH-1-2010).

*Oral Testimony* on behalf of the Canadian Association of Petroleum Producers regarding business risks faced by Alberta utilities in the Generic Cost of Capital hearing before the Alberta Utilities Commission, June, 2009.

*Written Evidence* on behalf of the Canadian Association of Petroleum Producers regarding business risks faced by Alberta utilities in the Generic Cost of Capital hearing before the Alberta Utilities Commission, March, 2009.

*Oral Testimony* on behalf of the Canadian Association of Petroleum Producers regarding business risks faced by Trans-Québec Maritimes Pipeline before the National Energy Board of Canada, October, 2008 (RH-1-2008).

*Oral Testimony* before the Alberta Utilities Board on behalf of Imperial Oil Resources and Exxon/Mobil Canada Energy, before the Alberta Energy and Utilities Board in the Matter of an Inquiry into Natural Gas Liquids Extraction, Application No. 1513726, June, 2008.

*Written Evidence* on behalf of the Canadian Association of Petroleum Producers regarding business risks faced by Trans-Québec Maritimes Pipeline before the National Energy Board of Canada, April, 2008 (RH-1-2008).

*Written Rebuttal Submission* on behalf of Imperial Oil Resources and Exxon/Mobil Canada Energy, before the Alberta Energy and Utilities Board in the Matter of an Inquiry into Natural Gas Liquids Extraction, November, 2007.